**GREAT NECK PLAZA, L.P., Plaintiff–Appellee,**

v.

**LE PEEP RESTAURANTS, LLC; Mitchel E. Rhoads; and Rhoads Holding, Ltd., Intervenors–Appellants.**

**No. 00CA1405.**

Colorado Court of Appeals, Div. I.

Aug. 16, 2001.

Certiorari Denied Jan. 14, 2002.

Arnold & Arnold, LLP, Richard M. Arnold, Lakewood, CO, for Plaintiff–Appellee.

Clanahan, Tanner, Downing & Knowlton, P.C., Chad M. McShane, Denver, CO, for Intervenors–Appellants.

Opinion by Judge DAVIDSON.

In this garnishment proceeding, intervenors, Le Peep Restaurants, LLC, Mitchel E. Rhoads, and Rhoads Holding, Ltd., appeal from the judgment entered in favor of plaintiff, Great Neck Plaza, L.P. We affirm.

At the time of the garnishment hearing, Mitchel Rhoads (Rhoads) was the president of Le Peep Restaurants, Inc. (Restaurants), Le Peep's Grill, Inc. (Grill), and Rhoads Holding, Ltd. (Rhoads Holding), and he also was the manager of Le Peep Restaurants, LLC (LLC). Rhoads testified that Rhoads Holding then owned Restaurants, Grill, and LLC.

The ownership history of these entities is complex. In 1992, Rhoads acquired Restaurants and Grill from a previous owner. Around the same time, Restaurants acquired the stock of Grill in exchange for a substantial portion of Restaurants' assets. According to his testimony, Rhoads lent a substantial sum of money to Restaurants and Grill at that time, over a million dollars to Restaurants alone.

In 1993, Rhoads formed Rhoads Holding, of which he is the sole owner.

Also in 1993, plaintiff brought suit in New York, naming Restaurants and Grill, among others, as defendants.

In 1998, Rhoads formed LLC in Nevada. LLC obtained a certificate of authority to transact business in Colorado in December 1999, after the garnishment took place.

In February 1999, Grill and Restaurants no longer received revenue, and they exchanged all their remaining assets for membership certificates of LLC. Also at this time, Rhoads filed a UCC–1 financing statement to perfect an earlier security interest in the assets of Restaurants, Grill, and Rhoads Holding. At the time, Rhoads was president of all three of these entities and manager of

LLC; Restaurants was still the sole owner of Grill stock; and Grill owned all the membership interest in LLC.

In June 1999, LLC opened the bank accounts at issue here. The funds in the accounts came from the operation of Le Peep restaurants that previously had submitted their income to Grill or Restaurants.

In July 1999, in the New York lawsuit, plaintiff obtained a judgment against, among others, Restaurants and Grill, but not LLC, which was not in existence at the time the suit began. Plaintiff promptly domesticated the judgment in Colorado and garnished the funds of intervenor LLC held at a bank in Colorado.

The writ of garnishment named as the judgment debtor "Le Peep Restaurants, Inc." (Restaurants), rather than "Le Peep Restaurants, LLC" (LLC), but contained the tax identification and bank account numbers of LLC. In November 1999, the bank deposited the funds from the accounts into the registry of the court.

Objecting to the garnishment, Rhoads, Rhoads Holding, and LLC—the intervenors—filed a motion to intervene, which the trial court granted. After an evidentiary hearing, the trial court determined that LLC's assets were owned by Grill, that Grill, Restaurants, and LLC were alter egos of each other, that fraudulent conveyances had occurred, and that defendants and intervenors had acted in concert to insulate assets from plaintiff's judgment. Thus, the court concluded that the funds were, in effect, owned by the judgment debtor and, therefore, properly subject to garnishment by plaintiff.

## I.

■ Intervenors argue that, in determining the ownership of the garnished funds, the court improperly considered issues of alter ego and fraudulent transfer. Under the circumstances here, we disagree.

■ Garnishment is a remedy set forth by statute and court rule. See § 13–54.5–101 et seq., C.R.S.2000; C.R.C.P. 103. Garnishment proceedings fall under the equity powers of the court, the purpose of garnishment

being to reach ordinarily nonleviable evidences of debt, to prevent the loss or dissipation of such assets, to determine the ownership of such funds, and to provide for the equitable distribution of such funds. See *Worchester v. State Farm Mut. Auto. Ins. Co.,* 172 Colo. 352, 473 P.2d 711 (1970).

■ The parties to a garnishment proceeding ordinarily include the debtor, the creditor, and the garnishee. However, anyone else who claims an interest in any personal property of any description that is the subject of any answer made by a garnishee may intervene in a garnishment proceeding as provided in C.R.C.P. 24. See C.R.C.P. 103 § 9.

Here, the garnishee bank released funds claimed to be property of the judgment debtors. Intervenors then moved to intervene, claiming the funds belonged to LLC, and not to Grill or Restaurants. In response, plaintiff asserted that the funds in the garnished accounts resulted from fraudulent transfers by intervenors and judgment debtors; that Rhoads was an insider of all the relevant corporate entities—Restaurants, Grill, LLC, and Rhoads Holding; and that all the relevant corporate entities were interrelated.

The trial court granted the motion to intervene and, at the hearing, allowed evidence pertaining to plaintiff's claims of fraudulent transfer and alter ego. In its order following the hearing, the trial court relied on these theories in reaching its conclusion that the funds, as property of the judgment debtor, were properly garnished. Intervenors contend that this was error. We disagree.

■ Generally, intervention should be liberally construed to permit settlement of all related controversies in one action. See *City of Delta v. Thompson,* 37 Colo.App. 205, 548 P.2d 1292 (1975). Here, the issues of alter ego and fraudulent transfer were directly related to the question raised by the intervenors, namely, the ownership of the garnished funds.

We agree with intervenors that the law is unsettled as to whether an alter ego claim can be addressed in a typical garnishment proceeding. Colorado courts have not ruled

on this question, and some courts from other jurisdictions permit use of the alter ego theory in a garnishment proceeding, while others do not. *See Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 778 F.Supp. 1116, 1122 (D.Colo.1991)("[I]t is unclear whether assertion of the alter ego doctrine is proper in a garnishment proceeding."). *Compare Aioi Seiki, Inc. v. JIT Automation, Inc.* 11 F.Supp.2d 950 (E.D.Mich.1998) (permitting piercing the corporate veil in garnishment proceedings), *and Olen v. Phelps*, 200 Wis.2d 155, 546 N.W.2d 176 (Ct.App.1996)(allowing use of the "reverse" alter ego doctrine to pierce the corporate veil in a garnishment proceeding), *with John Julian Construction Co. v. Monarch Builders, Inc.*, 324 A.2d 208 (Del.1974)(deeming use of the alter ego theory inappropriate in a garnishment action). Other courts, in declining to hear alter ego issues, reason that raising such issues in a garnishment hearing could implicate procedural due process rights of third parties. *See National Stabilization Agreement v. Evans*, 71 F.Supp.2d 427 (M.D.Pa.1999); *Strick Corp. v. Thai Teak Products Co.*, 493 F.Supp. 1210 (E.D.Pa.1980).

Similarly, although litigation of questions of fraudulent transfer from debtor to garnishee has been permitted in Colorado garnishment proceedings, *see Walk–In Medical Centers, Inc. v. Breuer Capital Corp., supra; Jones v. Langhorne*, 19 Colo. 206, 34 P. 997 (1893), the question of whether the scope of garnishment proceedings properly includes questions of fraudulent transfer involving other parties has not been specifically addressed.

By definition, however, an intervention such as the one here involves third parties. Such strangers to the original garnishment proceeding, by asserting ownership of the disputed property, necessarily put their ownership status, and all related questions, at issue. *Cf.* C.R.C.P. 103 § 11 (when garnishee files answer indicating that a third party claims garnished property, court clerk shall issue summons requiring such third party to appear to answer, set up, and assert a claim or be barred thereafter); *Maddalone v. C.D.C., Inc.*, 765 P.2d 1047 (Colo.App.1988) (discussing differences under C.R.C.P. 69 and C.R.C.P. 103).

Furthermore, due process concerns such as notice or an opportunity to be heard are unlikely to arise in the context of an intervention and simply were not implicated in this proceeding. The intervenors, having initiated the intervention, were on notice that their assertion of ownership would be challenged by claims such as alter ego and were given ample opportunity to be heard during the hearing. It is not surprising, then, that we can find no authority, and intervenors have provided none, barring litigation of alter ego or fraudulent transfer claims in the procedural posture presented here.

## II.

Alternatively, intervenors contend that the evidence was insufficient to support the trial court's findings as to alter ego or fraudulent transfer. We disagree.

If the record supports the trial court's findings, they are binding on appeal. *Linley v. Hanson*, 173 Colo. 239, 477 P.2d 453 (1970). When the appellate court can determine the basis of the trial court's decision and whether that decision was supported by competent evidence, the findings and conclusions are sufficient. *See, e.g., People v. Perse*, 750 P.2d 923 (Colo.App.1988).

Here, the court found that property "owned by the judgment debtor" was subject to garnishment under § 13–54.5–103, C.R.S. 2000. Summarizing the essential elements of the testimony, the trial court noted that Grill had transferred its assets to Restaurants in exchange for the stock of LLC. The trial court concluded that, in reality, the garnished funds were, at the time of garnishment, owned by Grill.

The trial court also observed that the New York lawsuit resulting in the judgment had been filed in 1993 and was nearing completion at the time Rhoads filed his UCC–1 financing statement in 1999. Noting that the secured party, Rhoads, was the "de facto controlling noncorporate personage" of all the Le Peep corporate and legal entities, the court determined that all the Rhoads and Le

Peep entities were acting in concert to insulate their assets.

### A.

◼ Alter ego is one theory for disregarding the corporate entity, or piercing the corporate veil. Piercing the corporate veil is an equitable remedy, requiring balancing of the equities in each particular case. *See Water, Waste & Land, Inc. v. Lanham,* 955 P.2d 997 (Colo.1998).

◼ The corporate entity may be disregarded, and corporate veil may be pierced, if not doing so would defeat public convenience, justify wrong, or protect fraud. Specifically, the veil may be pierced where the subsidiary is merely an alter ego of the principal. *See Fish v. East,* 114 F.2d 177 (10th Cir.1940).

◼ In determining whether to disregard the corporate entity, the court may consider certain factors, not all of which must be shown. These factors include:

(1) The parent corporation owns all or majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, 'the subsidiary' is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*See Skidmore, Owings & Merrill v. Canada Life Assurance Co.,* 907 F.2d 1026, 1027 (10th Cir.1990).

Intervenors argue that the trial court improperly relied on Grill's ownership of LLC's membership certificate to conclude that Grill owned the latter's assets. However, although we agree with intervenors that ownership of membership certificates or stock alone may not impute ownership of the assets of a corporate entity, *see* 11 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* §§ 5096, 5100 (rev. ed.1995), read in context, we do not interpret the court's order to say otherwise. To the contrary, the court's determination that the corporate entities were interchangeable relied on patterns of ownership, rather than on the isolated incident of ownership pointed out by intervenors here.

◼ Specifically, the record indicates that Rhoads was the president or manager of all the corporations in question and that he financed both Grill and Restaurants. The assets were moved gymnastically among the corporations for what Rhoads claimed to be tax reasons, a claim unsubstantiated in the evidence and, inferentially, disbelieved by the trial court.

Rhoads admitted at the hearing that, prior to the garnishment, no entity besides Grill was entitled to the profits and income of LLC. At the time of the garnishment, Rhoads owned all of the stock of, and served as president of, Rhoads Holding. Rhoads Holding owned Restaurants, Grill, and LLC. Restaurants owned all the stock of Grill. Grill owned LLC's membership certificates and the assets of Restaurants.

◼ Thus, because the record supports the court's decision to disregard the corporate fiction and treat the corporate entities as one, it is irrelevant that the writ of garnishment identified the "wrong" entity. Although we agree with intervenors that a writ of garnishment must name with particularity the party to be garnished, *see Berns, Clancy & Assoc. v. Bank of Boulder,* 717 P.2d 1022 (Colo.App.1986), here, because Restaurants was an alter ego entity of LLC, the writ of garnishment was proper.

## B.

██ Intervenors also argue that plaintiff failed to prove the elements necessary for fraudulent transfer and that the court erred in its conclusion that plaintiff, rather than Rhoads Holding, was entitled to the garnished funds. We disagree.

Fraudulent transfer occurs if the debtor made a transfer with an actual intent to hinder, delay, or defraud any creditor, or, in the alternative, without receiving a reasonably equivalent value in exchange for the transfer or obligation. *See* § 38–8–105(1)(a), (1)(b), C.R.S.2000.

To determine actual intent under § 38–8–105(1)(a), factors to be considered include whether: the transfer or obligation was to an insider; the debtor retained possession or control of the property transferred after the transfer; the transfer or obligation was disclosed or concealed; the debtor had been sued or threatened with suit before the transfer was made or obligation was incurred; the transfer was of substantially all the debtor's assets; the debtor absconded; the debtor removed or concealed assets; the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of obligation incurred; the debtor was insolvent; the transfer occurred shortly before or shortly after a substantial debt was incurred; or the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Section 38–8–105(2)(a)–(k), C.R.S.2000.

As relevant here, an insider of a corporate debtor is one who is a director, officer, or person in control of the debtor. § 38–8–102(8)(b)(I)–(III), C.R.S.2000. A transfer is every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. § 38–8–102(13), C.R.S.2000.

The trial court based its finding on the first prong of the fraudulent transfer test, whether the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor. With ample record support, the trial court found that, in effect, a "pea under a shell game" had been taking place and that all of the Le Peep and Rhoads entities were acting in concert to transfer and insulate the funds from an anticipated out-of-state judgment.

Here, there were at least two distinct fraudulent transfers: first, the transfer of funds to LLC and its bank account, and second, the filing of the UCC–1 statement to secure Rhoads' interest in Restaurants, Grill, and Rhoads Holding.

Regarding the first transfer, Rhoads, as president or manager of all the relevant entities, was an insider under the statute. He transferred assets from one corporation to another, in effect retaining possession or control of the property after the transfer. Because the New York lawsuit began in 1993, Rhoads was aware of the possibility of an adverse judgment, and he channeled funds from the soon-to-be named judgment debtors, Restaurants and Grill, to the account of the newly formed LLC, another entity controlled by Rhoads but not named in the New York lawsuit. Rhoads had not disclosed this transfer to plaintiff. The funds in LLC's bank accounts were comprised entirely of revenue formerly submitted to Restaurants' and Grill's accounts. By moving funds around, Rhoads removed assets from the judgment debtors and placed them in the possession of other entities under Rhoads' control.

██ As to Rhoads' security interest in Restaurants, Grill, and Rhoads Holding, the record supports the trial court's finding that this transaction also was a fraudulent conveyance.

Again, Rhoads, as president of Restaurants, Grill, and Rhoads Holding, was an insider of all three. The filing of the UCC–1 statement was a transfer under § 38–8–102(13). Rhoads had and retained control of all property owned by those three entities. All of the relevant corporate entities knew the New York suit was ongoing in February 1999, when Rhoads filed the statement. By filing the statement, Rhoads effectively at-

tempted to shield these assets from an out-of-state judgment.

Intervenors argue that there could be no determination that the transfers at issue were fraudulent because the trial court made no finding that they were made without receipt of a reasonably equivalent value. However, because the court properly found actual intent to defraud, such finding was unnecessary. Section 38–8–105(1) reads in the disjunctive, and a fraudulent transfer legitimately can be established either way.

In sum, using the proper legal standards, the trial court considered competent evidence to conclude that all the relevant entities were alter egos and that the elements of fraudulent transfer had been met. Thus, the funds were properly garnished as property of the judgment debtor.

The judgment is affirmed.

Judge METZGER and Judge ROY concur.